# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA; | Civil Action No. _____ |
| *ex rel.* The Bends LLP<br>1925 Lovering Avenue, City of Wilmington,<br>County of New Castle, Delaware 19806, | |
| Plaintiff, | **_QUI TAM_ ACTION**<br>**FILED UNDER SEAL** |
| v. | |
| ATLANTIC DIVING SUPPLY, INC. (ADS);<br>TRUE NORTH ENTERPRISES;<br>SAFETY AND SECURITY INTERNATIONAL;<br>LUKE HILLIER;<br>JASON WALLACE;<br>BRANT FELDMAN;<br>RYAN ANGOLD;<br>JOHN DUNN;<br>VINCENT MORAN;<br>KEVIN MORAN;<br>DAVID BOHANNAN; AND<br>TODD DIX; | **COMPLAINT FOR VIOLATIONS OF:**<br><br>**THE FEDERAL FALSE CLAIMS**<br>**ACT, 31 U.S.C. §§ 3729–3733** |
| Defendants. | |

## I.    <u>INTRODUCTION</u>

1.    Atlantic Diving Supply (ADS) is the country's 24th largest federal contractor with more than $3 billion in government sales. Most of ADS's government sales come through the Defense Logistics Agency's (DLA's) Tailored Logistics Support (TLS) program.

2.    TLS is an indefinite delivery indefinite quantity (IDIQ) multiple award contract set aside for small businesses. The Department of Defense (DoD) uses TLS as a general-purpose procurement vehicle, similar to GSA schedule contracts, to purchase everything from clothing and accessories to million-dollar weapons accessories and communication systems. Like a GSA schedule contract, any federal agency can order items or services through TLS.

3.    TLS grew from a $5 million contract around the time of September 11, 2001, into a ten-year $33 billion contract today. TLS utilizes six prime vendors that compete to source and supply each request for goods under the contract.

4.    Historically, ADS has captured and continues to capture the vast majority of business under the contract, securing billions of dollars in contracts a year.

5.    ADS has engaged in a multi-year fraudulent scheme to secure sales through TLS at grossly inflated prices. ADS uses certain affiliated companies, including True North Enterprises and Safety and Security International, to create fake "kits" of items to win bids under TLS and sell items at inflated prices.

6.    In certain circumstances, specifically when multiple items need to be used together in a pre-packaged, easy to transport manner, companies create "kits" for ease of use—such as putting different sized items together for an individual's use or packaging items in a custom case for protection. When done appropriately, value-added kitting is an acceptable practice whereby a defense contractor acquires multiple items and, using its expertise and labor,

combines those items into one ready-to-use kit. In doing so, the contractor may add significant value for the government, thereby justifying the higher price the contractor charges for the kit.

7.      ADS, however, directs its affiliates to create fake kits to sell to the government. These fake kits are a single item or a collection of items the ADS affiliate renames to make it appear as a product that the affiliate manufactures. But, in reality, the affiliate performs no actual work to create the kit and does nothing to create any value to justify charging the government a higher price. After ordering a fake kit, the government receives the same items in the same way as if the government ordered the items directly from the manufacturer. The only difference is the government pays an upcharge of 20 percent or more. ADS captures the vast majority of this upcharge as profit.

8.      ADS instructs the affiliates on the contents of the fake kit, dictates the price ADS will pay, and instructs the affiliate to post the fake kit to the affiliate's website at an inflated price, also set by ADS. Because ADS dictates all of the affiliate's pricing, ADS's competitors cannot engage in fair competition under the TLS contract. The price listed on the website provides the illusion to the government that the fake kit is a real commercial good, sold at a fair price. In reality, the government is overpaying by 20 percent or more for the contents of the fake kit.

9.      The affiliates provide no value to the government. They do not repackage the items, label them, or do anything to make the items more usable, durable or valuable for the government. In fact, the requested items are often shipped directly from the manufacturer to the government; the affiliate never has possession of the items. The only services the affiliates provide–reaching out to the actual manufacturers to price, order, and coordinate delivery of the items—is the role of the prime TLS contractors. The true role of the affiliates is to effectuate

ADS's fraudulent scheme and allow ADS to preempt competition with the other TLS prime contractors.

10.     Had the affiliates not created these fake kits at ADS's direction and ADS recommended the government order the fake kits instead of the underlying items, the government would have received the same items, in the same way, for at least 20 percent less. Instead, ADS and its affiliates improperly enriched themselves by using false statements and anti-competitive practices to profit at the government's expense.

11.     This scheme amounts to illegal price fixing and bid rigging. ADS approaches the affiliate company, instructs the company on the contents of the fake kit, and dictates the price at which the affiliate will offer the fake kit to ADS's competitors. If the affiliate refuses the terms ADS imposes, ADS will simply move the deal to a different affiliate. Thus, affiliates are not choosing to offer ADS a discount, but rather, ADS is dictating the price at which the fake kit should be sold and incentivizing the affiliate to participate by cutting them in on risk-free profit. In some instances, ADS even fronts the affiliate the money to purchase the items from the manufacturer.

12.     Additionally, in another separate, though related scheme to defraud the government, ADS exercises its market power to squeeze post-award discounts out of small businesses and then improperly keeps that discount for itself rather than passing it onto the government.

13.     The TLS contract clearly states that "[w]hen the Contractor is purchasing from subcontractors or other sources and receives a discount or rebates, the Contractor shall immediately pass these savings to the Government in the contract price and invoice for payment." Defense Logistics Acquisition Directive (DLAD) 52.217-9017 – Tailored Logistics

Support Purchasing Reviews (Nov. 2011) at (c). ADS directly violates this contract by improperly retaining all post-award discounts for itself rather than passing these on to the government.

14.      After ADS obtains an award under TLS, ADS immediately attempts to squeeze a discount from the subcontractor supplier. ADS typically offers some form of accelerated payment in order to extract a discount from the supplier. These discounts are significant—often up to five percent. Instead of passing these discounts on to the government as required by the contract, ADS uses the discounts to further line its own pockets.

15.      Most large, well-established suppliers do not succumb to ADS's pressure. Instead, ADS primarily preys on the very same small businesses that DoD's purchasing plan is designed to help.

## II.      PARTIES

16.      The Relator, The Bends, LLP, is a limited liability partnership organized in the State of Delaware. The Bends, LLP's registered office is 1925 Lovering Avenue, City of Wilmington, County of New Castle, Delaware 19806 and the name of the registered agent at such address is The First State Registered Agent Company.

17.      Defendant ADS is located at 321 Lynnhaven Parkway, Suite 160, Virginia Beach, Virginia.

18.      Defendant True North Enterprises is located at 1055 Laskin Road, Suite 300, Virginia Beach, Virginia.

19.      Defendant Safety and Security International is located at 4270 Piedmont Parkway, Suite 102, Greensboro, North Carolina.

20.      Defendant Luke Hillier is the owner and former President of ADS.

21.     Defendant Jason Wallace is the Chief Executive Officer of ADS.

22.     Defendant Brant Feldman is the Chief Sales Officer of ADS.

23.     Defendant Ryan Angold is the Executive Vice President, Market Sales of ADS.

24.     Defendant John Dunn is the Chief Financial Officer of ADS.

25.     Defendant Vincent Moran owns and controls True North Enterprises.

26.     Defendant Kevin Moran owns and controls True North Enterprises.

27.     Defendant David Bohannan owns and controls True North Enterprises.

28.     Defendant Todd Dix owns and controls Safety and Security International.

## III.    JURISDICTION AND VENUE

29.     This action arises under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33.

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. §§ 3730(b)(1) and 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

31.     Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Moreover, even had such a public disclosure occurred, Relator would qualify as an "original source" of the information in this Complaint.

32.     This Court has personal jurisdiction over each of the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process. Moreover, each of the Defendants maintain minimum contacts with the United States, and they all can be found in this District and transact business in this District, including business with the United States Department of Defense, which maintains several offices and centers of operation in this District.

33.     Venue is proper in this District and in this Division pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), 31 U.S.C. § 3732(a), and Local Civil Rule 3(B) and 3(C), because Defendants can be found in and/or transact business in this District. At all times relevant to this Complaint, each of the Defendants regularly conducted business within this District and within this Division. Moreover, numerous acts violating 31 U.S.C. §§ 3729-3733 occurred in this District, and a substantial part of the events giving rise to the claims alleged herein occurred here.

## IV.    DOD CONTRACTING & BID RIGGING

34.     DoD is the single largest government agency, with a $740.5 billion annual budget and 2.91 million service members and civilian employees. DoD maintains over 4,800 locations in over 160 countries. In 2020, DoD spent over $440 billion on federal contracts.

35.     DoD has dozens of sub-agencies, including the Defense Logistics Agency (DLA). DLA manages the global supply chain for DoD, supplies 86 percent of the military's spare parts, and supplies almost 100 percent of the fuel and troop support consumables, as well as numerous other goods and services.

36.     The Federal Acquisition Regulation (FAR) is the principal set of rules regarding government procurement in the United States. The FAR sets standard contract terms and definitions.

37.     Certain requirements of the FAR are modified or waived if the government purchases a commercial item. *See* FAR 12.503; FAR 12.504. This includes the Truthful Cost or Pricing Data and Truth in Negotiations Act requirements of the FAR. *See* FAR 12.504(c)(2).

38.     A commercial item is an item that "(i) has been sold, leased, or licensed to the general public; or (ii) has been offered for sale, lease, or license to the general public." FAR 2.101 Commercial Item (1). The FAR defines a catalog price as "a price included in a catalog, price list,

schedule, or other form that is regularly maintained by the manufacturer or vendor, is either published or otherwise available for inspection by customers, and states prices at which sales are currently, or were last, made to a significant number of buyers constituting the general public." *Id.* at (6)(i). Further, market prices are the "current prices that are established in the course of ordinary trade between buyers and sellers free to bargain and that can be substantiated through competition or from sources independent of the offerors." *Id*. at (6)(ii).

39.     DoD guidance clarifies that "[t]he mere fact that a service appears in a catalog does not make it commercial. This is true for commercial catalogs published on websites or commercial services sold on websites as well." Department of Defense Guidebook for Acquiring Commercial Items, Part A: Commercial Item Determination, January, 2018, at 44.

40.     An IDIQ contract is for an indefinite quantity of supplies or services for a fixed time. They are used when DoD cannot determine, above a specified minimum, the precise quantities of supplies or services that the government will require during the contract period. IDIQs help streamline the contract process and speed service delivery.

41.     A multiple award contract is a contract that is awarded to multiple contractors. Under a multiple award IDIQ, the government can streamline the contracting process while still maintaining competition between contractors designed to ensure the government pays the best possible price for the goods or services it needs.

42.     Bid rigging is "[a]ny agreement between competitors pursuant to which contract offers are to be submitted to or withheld from a third party." *United States v. Portsmouth Paving Corp*., 694 F.2d 312, 325 (4th Cir. 1982). It is therefore a species of horizontal price fixing among supposed competitors. *See Ruotolo v. Fannie Mae*, 933 F. Supp. 2d 512, 521 (S.D.N.Y. 2013); *see also United States v. Gosselin World Wide Moving, N.V.*, 411 F.3d 502, 508 (4th Cir.

2005) ("Bid rigging agreement is price-fixing agreement of the simplest kind.") (citations omitted).

43.     Bid rigging leads to false claims because it drives out competition and drives up prices to the government. *See United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543-45 (1943) (finding that contractors who secured contracts through collusive bidding were liable for claims arising under those contracts under the FCA), *superseded in part by statute on other grounds as stated in United States v. Johnson Controls, Inc.*, 457 F.3d 1009, 1016 n.5 (9th Cir. 2006); *see also United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 91 (2d Cir. 2012) ("If the government made payment based on a false statement, then that is enough for liability in an FCA case, regardless of whether that false statement comes at the beginning of a contractual relationship or later.").

## V.     <u>THE TLS CONTRACT</u>

44.     TLS is an IDIQ multiple award contract set aside for small businesses. There are two separate TLS IDIQ contracts under which ADS perpetrated its fraud: (1) TLS for Special Operational Equipment (TLS-SOE); and (2) TLS for Fire and Emergency Services Equipment (TLS-FESE). TLS-SOE is the primary tool used to procure items through DLA.

45.     The TLS-SOE contract was initially awarded in 1999 with a $5 million cap. After the terrorist attacks on September 11, 2001, and the ensuing wars in Iraq and Afghanistan, DoD began to use TLS-SOE to equip special forces and other forces as they deployed overseas. The cap was quickly raised to $200 million and the scope of items eligible under TLS expanded.

46.     In 2008, TLS-SOE was rebid for a five-year term with its cap raised to $5.7 billion, meaning the term of the contract is five years and the government can order up to $5.7 billion of goods.

47.     In 2013, TLS-SOE was rebid again with another five-year term with its cap raised to $10 billion. DLA also added two additional prime contractors to bring the total to six TLS-SOE prime contractors.

48.     The TLS-SOE contract was rebid in 2020 as a 10-year $33 billion cap. DLA also replaced two of the prime contractors during this rebidding.

49.     TLS-FESE was most recently rebid in 2016 with a $788 million cap.

50.     DLA manages the TLS-SOE and TLS-FESE the same way and they are governed by the same rules. As used in this Complaint, the term "TLS" refers to both the TLS-SOE and TLS-FESE contracts.

51.     At its core, TLS relies on competition between the prime contractors to ensure the government receives the best price for goods acquired through the contract.

52.     As the contract states, "[i]t is anticipated that each Tailored Logistics Support Contractor shall be as aggressive as possible in pursuing all discounts and rebates. TLS Contractors shall guarantee that DLA Troop Support and its customers will receive discounts and rebates equal to or better than the offerors most favored commercial customers with similar sales." Solicitation Schedule of Supplies at 2 (a). DLA specifically states that "Contractors are encouraged, when competing for delivery orders, to provide a quote less than their ceiling price." *Id.* at NOTE.

53.     The TLS contract contains multiple provisions that protect the government's interests.

54.     Per the TLS-SOE contract, DLA tracks data by manufacturer and manufacturer's part number. The prime contractors are required to submit a Monthly Usage Report (referred to as a MUR) "covering each order received under the contract." The report **"MUST CONTAIN**

THE *ACTUAL MANUFACTURER'S* NAME AND THE <u>MANUFACTURER'S PART</u>

<u>NUMBER.</u>" Statement of Work at 15. (emphasis in original).

55.     Further, the contract is limited to "items [that] are commercial products or modified commercial products which are identified by manufacturer's part number, or commercial item descriptions. All items are to conform to the manufacturer's commercial specifications." Statement of Work 2.d.

56.     The TLS prime contractors are required to:

a.   Establish and maintain adequate documentation to provide a complete and accurate history of purchase transactions to support vendors selected and prices paid; Statement of Work 16.b.5;

b.   Apply a consistent make-or-buy policy that is in the best interest of the Government; Statement of Work 16.b.6;

c.   Perform timely and adequate cost or price analysis and technical evaluation for each subcontractor and supplier proposal or quote to ensure fair and reasonable subcontract prices; Statement of Work 16.b.10;

d.   Document negotiations in accordance with FAR 15.406-3; Statement of Work 16.b.11;

e.   Seek, take, and document economically feasible purchase discounts, including cash discounts, trade discounts, quantity discounts, rebates, freight allowances, and company-wide volume discounts; Statement of Work 16.b.12; and

f.   Establish and maintain procedures to ensure performance of adequate price or cost analysis on purchasing actions; Statement of Work 16.b.22.

57. Additionally, the contract specifically requires that "[i]f the Contractor is unable to obtain quotes for competing items from two or more such independently-competing firms, the Contractor shall retain supplementing documentation for its rationale for selection of the suppliers solicited and chosen to supply the items, and for its determination that the price was fair and reasonable. The Contractor is responsible for maintaining this same documentation for all sole source/non-competitive actions. The following price reasonableness and documentation requirements are applicable to all purchases, regardless of dollar value." DLAD 52.217-9017 – Tailored Logistics Support Purchasing Reviews (Nov. 2011) at (b).

58. The contract further specifies that "a price is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business" and further that "the burden of proof shall be upon the Contractor to establish that the price is reasonable under the standards in Federal Acquisition Regulation (FAR) Subpart 15.4 and FAR 31.201-3." *Id.* at (b)(1).

59. The prime contractor is required to keep documents to show the price evaluation. The contract states that "[t]he Contractor shall keep the documentation to a minimum, but shall retain data supporting the purchases either by paper or electronically. At a minimum, price quotations and invoices shall be retained. Should the Contractor receive an oral price quotation, the Contractor shall document who the supplier or subcontractor is by complete name, address, telephone number, price, terms and other conditions quoted by each vendor. Price quotes for supplies shall be broken down by individual items, shipping costs, and any other included expenses." *Id.*

60. The contract further requires that "[w]hen the Contractor is purchasing from subcontractors or other sources and receives a discount or rebates, the Contractor shall

immediately pass these savings to the Government in the contract price and invoice for payment." *Id.* at (c).

61.     The TLS-FESE contract contains similar terms.

## VI.     ADS'S FRAUDULENT SCHEMES

### A.     ADS's History on TLS

62.     ADS is the successor company of a small diving shop in Norfolk that served members of the Navy's SEAL teams. In an effort to break into the government contracting space, ADS won a place as one of the TLS contractors around 1999.

63.     After September 11, 2001, special operations forces deployed to Iraq and Afghanistan and needed quick access to additional goods. The government identified the TLS contract as an easy way to quickly procure goods, and soon raised the $5 million cap to over $200 million and expanded the scope of the contract to cover most of the needs of the newly deployed forces.

64.     ADS captured most initial contracts and grew quickly along with the TLS contract. ADS used its growing size to gain a level of financial solvency the other prime contractors could not match, allowing ADS to continue to win the most contracts. ADS made itself effectively synonymous with TLS, growing to meet whatever product the government needed and creating exclusive relationships with most major manufacturers in the DoD space.

65.     In only a few months in 2018, ADS captured $639,205,447.81 in TLS-SOE contract revenue, amounting to 83 percent of the total contracts under TLS-SOE. In 2019, ADS captured $2,124,044,990.82 in contracts, amounting to 74 percent of contracts under TLS-SOE. In 2020, ADS captured $3,991,747,235.28 in contracts, amounting to 71 percent of contracts under TLS-SEO. And already in 2021, ADS has captured $310,077,851.64 in contracts, amounting to 72 percent of contracts under TLS-SOE.

### B.    ADS's Salesforce

66.     ADS employs a vast salesforce of almost 200 people. The salesforce fosters relationships with various armed services divisions and bases. They even deploy to warzones, including Iraq and Afghanistan.

67.     ADS sales representatives encourage DoD end users, largely US servicemen and women, to use TLS and promotes products that will ensure ADS wins the contract at the highest margin.

68.     ADS judges its sales representatives by the profit margin ADS receives through their sales. The expectation is the sales representatives will either use only ADS's preferred manufacturers or steer DoD purchasers to select items that meet a minimum profit margin of 21 percent for ADS.

69.     Because TLS is a DLA contract, DLA employees act as the contracting officers. The DLA employees do not have a relationship with the end users at DoD, such as special operations units deployed overseas. Instead, leveraging relationships developed through its sales representatives and personal relationships developed by its executives, ADS inserts itself between the DLA contracting officers and the DoD end user, and acts as the end users main point of communication. These end users are often mission-oriented and unsophisticated in government contracting. They are focused more on receiving the necessary supplies within their budget than ensuring fair and reasonable pricing.

70.     The end users are often young, non-commissioned officers put in charge of procuring the necessary supplies. ADS sales representatives try to obtain from the end user the list of items they need to procure. That list is referred to as the Bill of Material or BOM (pronounced "bomb"). The ADS sales representative also attempts to obtain the end user's

budget. Armed with this information, ADS can steer the end user to the items that provide ADS

the most profit.

71.    ADS encourages this practice on their website:

## 6. ADS CAN...

- Help you tackle road blocks early on.
- Help you select equipment that fits your needs and requirements.
- Provide procurement options through both of our FES and SOE TLS contracts.
- Keep you updated on shipping information when your order is complete.

**HOW TO ORDER:**

- **Send RFQ to ADS**
  - Request a quote from your ADS Account Manager. They will help you identify the best procurement options for your requirements – GSA, TLS, Open Market, etc.
- **ADS Provides Quote**
  - Our knowledgeable ADS Account Managers can help you select equipment to satisfy your requirements, determine procurement options, as well as verify part numbers, lead times, pricing (including freight), and country of origin.
- **Register for the Program**
  - If you determine that the TLS Program is best for your requirement, register for the corresponding TLS Program with DLA Troop Support.
  - Instructions for Customer/FOPOC Registration:
    - FESE | SOE
- **Submit Your Order**
  - Email your completed order request to DLA Troop Support. They will act as your contracting office.
    - Contact Info: SOE TLS Orders: SOEorders@dla.mil
    - Contact Info: FESE TLS Orders: FESorders@dla.mil
- **You're All Set!**
  - DLA Troop Support will complete the requirement amongst the participating TLS vendors and provide the best pricing for all items requested.
  - Once approved, DLA Troop Support will contact you and your FOPOC for funding information.
  - Once that is processed, an award will be made!

https://adsinc.com/6-important-things-you-need-to-know-about-dlas-tls-contracts-in-2017/ (last

visited March 22, 2021).

### C.    Fake Kitting

72.    ADS, through its affiliates True North Enterprises and Safety and Security

International, creates fake kits to sell to the government. At ADS's direction, the affiliates take a

-15-

single item or a collection of items from other manufactures and renames the item or items to give the impression it is a kit the affiliate manufactures. But, in reality, the affiliate performs no actual work to create any value that would justify charging the government a higher price. After ordering a fake kit, the government receives the same items in the same way as if the government ordered the items directly.

### 1. How Kitting Started

73.     ADS began creating fake kits through affiliates in or around 2012. Before that time, ADS would directly offer to the government fake kits that ADS purported to manufacture. However, in or around 2012, DLA disallowed ordering items under TLS where a prime contractor is the manufacturer. The TLS contract relies on competition between the prime contractors to ensure the government receives fair and reasonable pricing for the items it needs. DLA ruled it was not possible to prove fair and reasonable pricing when a prime contractor is the manufacturer because the other prime contractors cannot meaningfully compete.

74.     Instead of ending the now-barred practice, ADS began using affiliated companies to create fake kits in order to continue to capture the excessive markup and maintain its artificially inflated profit margin.

75.     At first, ADS used a company called True North Enterprises to perpetrate the fake kitting scheme. True North Enterprises is, and at all material times has been, owned and controlled by Vincent Moran, Kevin Moran, and David Bohannan. These three individuals also own and control London Bridge Trading, one of ADS's preferred manufacturers with whom ADS maintains a close relationship. At the time True North Enterprises began creating fake kits for ADS, it was just a shell corporation with no actual business.

76.     Soon after, ADS expanded the fraudulent practice to another shell company, Safety and Security International. Safety and Security International is, and at all material times has been, owned and controlled by Todd Dix. Todd Dix also owns and controls Dix Defense, one of ADS's preferred suppliers and manufacturer's representatives with whom ADS has a close relationship. At the time Safety and Security International began creating fake kits for ADS it was just a shell corporation with no actual business operation.

77.     ADS continues to use True North Enterprises and Safety and Security International when it wants to create fake kits to sell under the TLS contracts. For all of these sales, ADS coordinated with these affiliates to dictate the terms of the sales and deceive the government into purchasing the fake kits at an inflated price.

## 2.      Creating a Fake Kit

78.     When ADS's sales representatives learn that a DoD end user wants certain items, ADS sales representatives determine if ADS has an exclusive relationship that would directly allow ADS to capture an outsized profit. If not, ADS tries to sell DoD the items through a fake kit. In that situation, ADS takes the BOM and tells the end user it will be back in touch with a solution.

79.     ADS subsequently either prices the items itself or tells its affiliate, normally either True North Enterprises or Safety and Security International, to price the items and report the cost to ADS.

80.     ADS then dictates to the affiliate, often over the phone, the price at which the affiliate needs to sell the fake kit to ADS and the price at which the affiliate needs to post the fake kit on their website. ADS also ensures the cost of the kit fits within the DoD end user's budget.

81.     With this information in hand, the affiliate creates a description of the kit that provides sufficient detail without providing enough information to specifically identify the true manufacturer(s) or part number(s) of items in the kit. The affiliate subsequently posts the fake kit on its website at the price dictated by ADS.

82.     Once the fake kit is posted on the affiliate's website, the ADS sales representative informs the DoD end user that the fake kit contains the items requested in the BOM. ADS regularly fills in the form the DoD end user provides to DLA for the order. This excel includes the manufacturer name and manufacture part number. ADS inserts, or instructs the DoD end user to insert, the affiliates name and part number.

83.     The description, manufacturer, and manufacturer part number go to DLA to determine if the item is eligible for the TLS contract. At this point, DLA checks if the item is within the scope of the contract.

84.     DLA also confirms the item is a commercial product. If DLA can find the item on a website at a listed price, then DLA assumes that the price meets the definition of a catalog commercial price. Given the volume of requests flowing through TLS, DLA does not request further evidence beyond the price listed on the website to determine if the products is set at a commercial price.

85.     When DLA puts the fake kit out for bid, each prime contractor contacts the ADS affiliate and receives the ADS-dictated price listed by the affiliate on its website. The other prime contractors often also receive worse delivery or pre-payment terms than the affiliate provides to ADS. In order to cover their own overhead, expenses, and build in a standard, acceptable profit margin, the other prime contractors must bid at a markup to the ADS-dictated price, even while receiving the inferior delivery terms quoted by the affiliate. In contrast, ADS bids at or near the

artificially inflated ADS-dictated price, knowing it will win the contract because its own overhead, expenses, and extreme profit margin have already been built into the price listed on the affiliate's website.

86.     In or around 2018 ADS modified its scheme. The affiliates began quoting the other prime contractors a discount off the ADS-dictated price listed on the affiliate's website. ADS then bid a further discount in order to win the contract. However, upon information and belief, ADS simply further inflated the ADS-dictated price listed on the affiliate's website in order to maintain its inflated profit margin.

87.     The other TLS prime contractors do not know what is in the fake kit so they are unable to bid the underlying items directly from the manufacturer.

88.     The items often "drop-ship" to the end user directly from the actual manufacturer, never passing through the affiliate. Drop-shipping is a retail term where a business never has the items in stock and instead the items are purchased from a third party and shipped by the third party to the customer. While DLA generally expects the prime contractors to drop-ship the items to DoD, it is expected that the prime contractors will purchase the items from the actual manufacturer, not another middleman also engaged in drop-shipping. Accordingly, unlike real value-added kitting, neither ADS nor the affiliate ever performs any work to make the items more useable, durable, or transportable than they are when purchased directly from the manufacturer.

89.     In fact, the affiliates maintain only a skeleton crew of employees and operate out of a storefront rather than a warehouse or other industrial facility. The affiliates therefore do not even have the capability to perform the type of value-added work DoD expects when it orders a kit. Instead, the affiliates merely have the capacity to process the orders from ADS.

90.     Because these affiliates are little more than fly-by-night organizations set up to act as affiliates to ADS, they often lack the funds to purchase the requested items from the manufacturers. In those cases, ADS provides whatever capital is needed to the affiliate so it can purchase the items without delay, such as when a manufacturer requires payment before delivery. These advances are often not tied directly to a particular subcontract but merely because the affiliate requests funds from ADS.

91.     When the government end user receives the items, ADS invoices DLA. DLA then pays ADS within twenty days. ADS, in turn, sends the affiliate the cost of the items plus the small markup. ADS pockets the remainder.

92.     This practice allows ADS to control competition and dictate price because every TLS prime contractor must try to procure the fake kit from the ADS affiliate. ADS's goal is to always achieve a profit of 20 percent or more, and through fake kitting ADS regularly meets this goal.

93.     True North Enterprises' primary business is engaging in fake kitting on behalf of ADS.

 a.  90 percent of the parts listed on True North Enterprises' website were sold to the government through a TLS request for quote.

 b.  True North Enterprises has fewer than six employees, each of whom are either employed by ADS's preferred manufacturer London Bridge Trading or receive benefits from London Bridge Trading.

 c.  True North Enterprises does not have workspace or resources to conduct value-added kitting. In the rare instances where True North Enterprises received items from the manufacturer (as opposed to the manufacturer drop-shipping the items

directly to the government), True North Enterprises has to use London Bridge
Trading workspace and resources.

d. True North Enterprises is owned and controlled by Vincent Moran, Kevin Moran,
and David Bohannan. These three individuals worked directly with ADS to create
the fake kitting scheme and direct their staff to work with ADS to create the fake
kits and post the fake kits to True North Enterprises website.

94. Safety and Security International's primary business is engaging in fake kitting on
behalf of ADS.

a. Safety and Security International had only three employees for most of its
existence. Recently ADS began to move employees to Safety and Security
International to keep down ADS's own headcount.

b. Todd Dix owns, operates, and spends most of his time on his other company, Dix
Defense.

c. Safety and Security International lists three offices on its website—Greensboro,
North Carolina; Virginia Beach, Virginia; and Bloomfield, Indiana. However, the
Greensboro office, listed as "HQ" is actually the primary office of Dix Defense,
Tod Dix's primary company. The Virginia Beach office is the location of Secubit,
another of Todd Dix's companies. The Bloomfield office is the office of another
company, Paragon Force. Additionally, the photos of these three offices are all
stock photos and not actual photos of the locations.

d. Safety and Security International is owned and controlled by Todd Dix. Upon
information and belief, Todd Dix worked directly with ADS to implement the
fake kitting scheme at Safety and Security International and directed his staff to

work with ADS to create the fake kits and post the fake kits to Safety and Security International's website.

95.     ADS created the fake kitting scheme, directed its operations, and reaped the financial reward.

   a.   Luke Hillier owns and controls ADS. Upon information and belief, Hillier approved the scheme to sell fake kits and directed its operations.

   b.   Jason Wallace is the current Chief Executive Officer of ADS. Wallace has a close relationship with Vincent Moran, Kevin Moran, Bohannan, and Dix. Wallace oversaw and directed the operation of the fake kitting scheme.

   c.   Brant Feldman is the Chief Sales Officer for ADS. As the head of sales, Feldman is directly responsible for the fake kitting scheme and instructed his sales team to implement the scheme.

   d.   Ryan Angold is the Senior Vice President for Market Sales for ADS. Angold is responsible for implementing Feldman's directions and carrying out the fake kitting scheme.

   e.   John Dunn is the Chief Financial Officer of ADS. Dunn is responsible for providing True North Enterprises and Safety and Security International the financial support necessary to carry out the fake kitting scheme.

### 3.     Examples of Fake Kits

96.     Recently, DLA put out a bid for Safety and Security International's Integrated Laser Designation System. The kit is listed on SSI's website for $190,000.00.

97.     This kit only contains the Leonardo Electronics Type 163 Laser Designator System, which Leonardo Electronics sells with the laser designator, tripod, and case, for $131,944.00. The description Safety and Security International provided to DLA is "Kit

includes Qty 1 each of the following: Laser Designation System; Forward Air Controller

200BLK, Laser Designator Battery Adaptor Tripod System Ruggedized Operational Loadout

System; Coyote" and listed the item description as "SELEX TYPE 163 LASER TARGET

DESIGNATOR (LTD)." Safety and Security International used the name Selex, a company

purchased by Leonardo Electronics, to obscure the fact the kit is merely a Leonardo Electronics

item. The Safety and Security International kit, which is no different than the system from

Leonardo Electronics item, is $58,056 more expensive, almost a 44 percent markup.

98.     One of the first fake kits ADS ever created was for training on the UH-60 Black

Hawk helicopter. ADS, through its connections to the contractor providing the training to the

government, learned the government needed to purchase certain training displays and

accessories. ADS, through its affiliate True North Enterprises, created a fake kit that was the

display and accessories necessary to conduct the training, and called it a MEDEVAC kit.

99.     These kits were nothing more than the unaltered training equipment drop-shipped

from the manufacturer. ADS used True North Enterprises to inflate the costs by 20 percent or

more and capture the increased costs for its own profit.

100.    Since 2016, ADS has been awarded $106,352,682.70 in contracts for these fake

MEDEVAC kits.

      a.  On June 15, 2016, ADS was awarded a $10,742,174.63 contract for a True North

           Enterprises kit containing "MEDEVAC BASE FRAME ASSEMBLY 3.0,

           MEDEVAC BASE FRAME ASSEMBLY 3.1, MEDEVAC TRAINING PILOT

           MODULE 6.0, MEDEVAC TRAINING PILOT ACCESSORIES 2.0,

           MEDEVAC TRAINING DISPLAY MODULE 5.0, MEDEVAC TRAINING

           DISPLAY ACCESSORIES 1.1, MEDEVAC TRAINING DISPLAY

ACCESSORIES 1.2." Upon information and belief, this was a fake kit marked up by 20 percent or more.

b. On August 8, 2016, ADS was awarded a $4,356,589.02 contract for a True North Enterprises kit containing "MEDEVAC TRAINING INSTRUCTION MODULE 5.1, MEDEVAC TRAINING DISPLAY MODULE 5.1, MEDEVAC BASE FRAME ASSEMBLY 3.2, MEDEVAC TRAINING DISPLAY ACCESSORIES 1.3." Upon information and belief, this was a fake kit marked up by 20 percent or more.

c. On September 19, 2016, ADS was awarded a $821,885.14 contract for a True North Enterprises kit containing "MEDEVAC TRAINING INSTRUCTOR ACCESSORIES 6.0." Upon information and belief, this was a fake kit marked up by 20 percent or more.

d. On February 2, 2017, ADS was awarded a $1,817,830.52 contract for a True North Enterprises kit containing "MEDEVAC Training Display Module 6.1." Upon information and belief, this was a fake kit marked up by 20 percent or more.

e. On May 15, 2017, ADS was awarded a $9,569,991.00 contract for a True North Enterprises kit containing "MEDEVAC BASE FRAME ASSEMBLY 4.0, MEDEVAC TRAINING DISPLAY MODULE 8.0, MEDEVAC TRAINING DISPLAY ACCESSORIES 4A, MEDEVAC TRAINING DISPLAY ACCESSORIES 4B, MEDEVAC TRAINING PILOT ACCESSORIES 8A, MEDEVAC TRAINING PILOT ACCESSORIES 8B, MEDEVAC TRAINING PILOT MODULE 8.0, MEDEVAC TRAINING PILOT MODULE 8.1,

MEDEVAC TRAINING PILOT MODULE 8.2." Upon information and belief, this was a fake kit marked up by 20 percent or more.

f. On August 12, 2017, ADS was awarded a $297,175.00 contract for a True North Enterprises kit containing "MEDEVAC TRAINING DISPLAY ACCESSORIES 9A." Upon information and belief, this was a fake kit marked up by 20 percent or more.

g. On September 28, 2017, ADS was awarded a $306,372.99 contract for a True North Enterprises kit containing "MEDEVAC TRAINING DISPLAY ACCESSORIES 9B." Upon information and belief, this was a fake kit marked up by 20 percent or more.

h. On March 9, 2018, ADS was awarded a $5,808,244.24 contract for a True North Enterprises kit containing "MEDEVAC TRAINING PILOT MODULE 12, MEDEVAC BASE FRAME ASSEMBLY 12B, MEDEVAC TRAINING DISPLAY ACCESSORIES 12.1, MEDEVAC TRAINING DISPLAY MODULE 12.1, MEDEVAC BASE FRAME ASSEMBLY 12A." Upon information and belief, this was a fake kit marked up by 20 percent or more.

i. On August 20, 2018, ADS was awarded a $5,122,993.44 contract for a True North Enterprises kit containing "MEDEVAC TRAINING DISPLAY ACC 15, MEDEVAC TRAINING DISPLAY MODULE 15, MEDEVAC TRAINING PILOT MODULE 15, MEDEVAC BASEFRAME ASSEMBLY 15." Upon information and belief, this was a fake kit marked up by 20 percent or more.

j. On October 5, 2018, ADS was awarded a $3,448,227.54 contract for a True North Enterprises kit containing "MEDEVAC TRAINING DISPLAY MODULE 16,

MEDEVAC TRAINING DISPLAY ACC 16, MEDEVAC TRAINING PILOT MODULE 16, MEDEVAC BASEFRAME ASSEMBLY 16, MEDEVAC BASEFRAME ASSEMBLY 16." Upon information and belief, this was a fake kit marked up by 20 percent or more.

k. On October 12, 2018, ADS was awarded a $8,250,489.68 contract for a True North Enterprises kit containing "MEDEVAC TRAINING DISPLAY ACC 14, MEDEVAC TRAINING DISPLAY MODULE 14, MEDEVAC TRAINING PILOT MODULE 14, MEDEVAC BASE FRAME ASSEMBLY 14, MEDEVAC TRAINING PILOT MODULE 13." Upon information and belief, this was a fake kit marked up by 20 percent or more.

l. On November 2, 2018, ADS was awarded a $8,033,806.29 contract for a True North Enterprises kit containing "MEDEVAC TRAINING DISPLAY ACCESSORIES 17A, MEDEVAC TRAINING DISPLAY ACCESSORIES 17B, MEDEVAC TRAINING PILOT MODULE 17, MEDEVAC TRAINING DISPLAY MODULE 17A, MEDEVAC TRAINING DISPLAY MODULE 17B, MEDEVAC BASE FRAME LOGISTICS, MEDEVAC BASE FRAME ASSEMBLY 17A, MEDEVAC BASE FRAME ASSEMBLY 17B." Upon information and belief, this was a fake kit marked up by 20 percent or more.

m. On January 25, 2019, ADS was awarded a $5,143,866.55 contract for a True North Enterprises kit containing "MEDEVAC TRAINING DISPLAY ACCESSORIES 18, MEDEVAC TRAINING PILOT MODULE 18, MEDEVAC TRAINING DISPLAY MODULE 18, MEDEVAC BASE FRAME ASSEMBLY 18A, MEDEVAC BASEFRAME ASSEMBLY 18B, MEDEVAC BASE FRAME

LOGISTICS 18." Upon information and belief, this was a fake kit marked up by 20 percent or more.

n.  On June 4, 2019, ADS was awarded a $8,300,694.44 contract for a True North Enterprises kit containing "MEDEVAC TRAINING DISPLAY ACCESSORIES 19, MEDEVAC TRAINING PILOT MODULE 19A, MEDEVAC TRAINING PILOT MODULE 19B, MEDEVAC TRAINING DISPLAY MODULE 19A, MEDEVAC TRAINING DISPLAY MODULE 19B, MEDEVAC TRAINING DISPLAY MODULE 19C, MEDEVAC BASE FRAME ASSEMBLY 19A, MEDEVAC BASE FRAME ASSEMBLY 19B, MEDEVAC BASE FRAME LOGISTICS 19." Upon information and belief, this was a fake kit marked up by 20 percent or more.

o.  On August 6, 2019, ADS was awarded a $9,425,046.45 contract for a True North Enterprises kit containing "MEDEVAC TRAINING DISPLAY MODULE 20, MEDEVAC TRAINING DISPLAY ACCESSORIES 20, MEDEVAC TRAINING PILOT MODULE 20A, MEDEVAC TRAINING PILOT MODULE 20B, MEDEVAC BASE FRAME ASSEMBLY 20A, MEDEVAC BASE FRAME ASSEMBLY 20B, MEDEVAC BASE FRAME ASSEMBLY 20C, MEDEVAC BASE FRAME LOGISTICS 20, MEDEVAC BASE FRAME LOGISTICS & SUPPORT 20." Upon information and belief, this was a fake kit marked up by 20 percent or more.

p.  On February 19, 2020, ADS was awarded a $12,445,020.25 contract for a True North Enterprises kit containing "MEDEVAC TRAINING DISPLAY ACCESSORIES 21A, MEDEVAC BASE FRAME ASSEMBLY 21A,

MEDEVAC TRAINING DISPLAY MODULE 21, MEDEVAC BASE FRAME ASSEMBLY 21B, MEDEVAC BASE FRAME LOGISTICS 21A, MEDEVAC BASE FRAME LOGISTICS 21B, MEDEVAC TRAINING DISPLAY ACCESSORIES 21B, MEDEVAC TRAINING PILOT MODULE 21A, MEDEVAC TRAINING PILOT MODULE 21B, MEDEVAC BASE FRAME ASSEMBLY 21C." Upon information and belief, this was a fake kit marked up by 20 percent or more.

q. On May 21, 2020, ADS was awarded a $12,436,280.52 contract for a True North Enterprises kit containing "MEDEVAC TRAINING DISPLAY MODULE 22A, MEDEVAC Training Display Accessories 22A, MEDEVAC Training Display Accessories 22B, MEDEVAC Training Pilot Module 22A, MEDEVAC Base Frame Assembly 22A, MEDEVAC Base Frame Assembly 22B, MEDEVAC Base Frame Assembly 22C, MEDEVAC Training Display Module 22B, MEDEVAC Base Frame Logistics 22B, MEDEVAC Base Frame Logistics 22B." Upon information and belief, this was a fake kit marked up by 20 percent or more.

r. On September 9, 2020, ADS was awarded a $25,995.00 contract for a True North Enterprises kit containing "MEDEVAC TRAINING PILOT MODULE 23." Upon information and belief, this was a fake kit marked up by 20 percent or more.

101. Upon information and belief, each of the purchases listed on attachment A are fake kits.

### 4. Material Misrepresentations Regarding Fake Kits

102. The Defendants made and caused to be made multiple false statements in order to sell the fake kits.

103.    First, the affiliate posts the fake kit on its website with a fake commercial price. The only reason the affiliate posts the fake kit on its website is to give the appearance of a commercial catalog price. However, the affiliate neither has nor expects to sell the fake kit at this price to anyone other than the government. Instead, ADS posts the fake kit at the inflated price solely to misrepresent to the government that the fake kit is a commercial item.

104.    Second, the affiliate misrepresents that the fake kit is an actual value-added kit. The affiliate does not identify the items within the fake kit. Instead, the affiliate purposefully gives the false impression the kit is a new product offered by the affiliate rather than just items from other manufacturers with no value added.

105.    Third, ADS provides the affiliates name and part number as the manufacturer and manufacturer's part number to the government official who places the order. ADS is falsely representing that the affiliate is the kit's manufacturer and that the fake kit is a commercial product. However, the affiliate does nothing to meet any definition of manufacturer and the fake kit is not commercial and therefore does not qualify under the TLS contract.

**5.      Bid-Rigging**

106.     At its core, ADS's scheme is to fix the market for certain bids under the TLS contract.

107.    The ultimate government purchaser merely wants the underlying goods. ADS uses its sales and marketing efforts to persuade the government to instead order the fake kit.

108.    ADS does this in order to control the market. ADS sets the price for its competitors. ADS sets the price it will pay the affiliate. And when the request comes from DLA, ADS knows it will win because ADS controls the market.

109.    For each fake kit, ADS improperly controls the market in order to ensure it would win the contract.

**D.      ADS Obtains Discounts it Improperly Fails to Pass to the Government**

110.    ADS subcontracts with numerous small business manufacturers. These small businesses, and some of the larger companies, are very cost sensitive. Because the government pays 20 days after delivery (referred to as "Net 20"), most prime contractors will only pay subcontractors 30 days after delivery (referred to as "Net 30"). The subcontractors have to outlay significant expenses to manufacture and deliver the goods. If the subcontractor does not have the internal capital, they may have to obtain financing to complete the order.

111.    ADS takes advantage of this dynamic to secure additional discounts. After winning a contract under TLS, ADS reaches out to subcontractor to negotiate an additional discount. ADS offers upfront payment or other inducements to entire the subcontractor to offer a discount.

112.    ADS often obtains an additional discount of up to 5 percent.

113.    ADS can only obtain additional discounts from companies that need the financial support of upfront payment, generally small businesses, which are the most vulnerable companies and the type of companies the government wants to help grow. These small businesses are the most susceptible to short term funding constraints and are therefore the most willing to give a discount in exchange for upfront payment.

114.    ADS is required to immediately pass along any discount to the government. But ADS keeps the entire amount of the discount for itself. DLAD 52.217-9017 – Tailored Logistics Support Purchasing Reviews (Nov. 2011) at (c).

115.     When ADS ultimately requests payment for the full amount of the contract, without any discount passed along to the government, ADS submits a false claim.

## VII.   CLAIMS FOR RELIEF

**Claim for Relief I**
**Violations of the False Claims Act (31 U.S.C. § 3729(a)(1)(A))**
**Presentation of False Claims**
**(All Defendants)**

116.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

117.     Through the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment.

118.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests, materially false and fraudulent claims for payment.

119.     The Government paid claims and incurred losses, and/or contractors, grantees, or other recipients of Government funds used to advance Government interests paid claims and incurred losses, as a result of Defendants' wrongful conduct.

120.     The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that the Government would not have paid but for Defendants' illegal conduct.

121.     By reason of such false and/or fraudulent claims, the Government has been damaged in a substantial amount to be determined at trial and is entitled to three times its damages plus a civil penalty as required by law for each violation.

**Claim for Relief II**
**Violations of the False Claims Act (31 U.S.C. § 3729(a)(1)(B))**
**Use of False Statements**
**(All Defendants)**

122.    Relator incorporates by reference herein each of the preceding paragraphs as if fully set forth in this paragraph.

123.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests.

124.    The Government paid claims and incurred losses, and/or contractors, grantees, or other recipients of Government funds used to advance Government interests paid claims and incurred losses, as a result of Defendants' wrongful conduct.

125.    By reason of such false and/or fraudulent claims, the Government has been damaged in a substantial amount to be determined at trial and is entitled to three times its damages plus a civil penalty as required by law for each violation.

**Demand for Jury Trial**

126.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: March 29, 2021

**BLACK & BUFFONE PLLC**

John W. Black
(*pro hac vice* motion forthcoming)
Samuel J. Buffone, Jr.
(*pro hac vice* motion forthcoming)
Black & Buffone PLLC
1400 Eye St. NW
Suite 200
Washington, D.C. 20005
Telephone: (202) 997-8562
John@blackandbuffone.com
Sam@blackandbuffone.com

**McGILLIVARY STEELE ELKIN LLP**

Gregory K. McGillivary
(VSB No. 25689)
McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave., NW
Suite 1000
Washington, D.C. 20005
Tel: (202) 833-8855
Fax: (202) 452-1090
gkm@mselaborlaw.com

*Attorneys for Plaintiff-Relator The Bends, LLP*